UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                         Plaintiff,                        Case Number 14-20117

v.                                            Honorable David M. Lawson

CHRISTOPHER BALL,

                         Defendant.

_____/

## ORDER DENYING MOTION FOR COMPASSIONATE RELEASE

Defendant Christopher Ball has filed a motion asking the Court to reduce his prison sentence to time served under the compassionate release provision of 18 U.S.C. 3582(c)(1)(A)(i), as amended by section 603(b)(1) of the First Step Act of 2018, Pub L. 115-391, 132 Stat. 5194, 5239, or alternatively, to recommend to the Bureau of Prisons (BOP) that he be transferred to home confinement under the Coronavirus Aid, Relief, and Economic Security (CARES) Act, 18 U.S.C. 12003(b)(2). He has served roughly half of his 120-month sentence for drug distribution crimes. The government takes issue with Ball's exhaustion of his administrative remedies within the Bureau of Prisons (BOP), a necessary prerequisite for seeking compassionate release. There is no merit to that argument. The government also argues that Ball has not demonstrated that extraordinary circumstances justify immediate release, he would be a danger to the community, and the factors in 18 U.S.C. § 3553(a) weigh strongly against release. Ball has not shown that the factors in section 3553(a) favor immediate release. The Court also does not believe that a recommendation for early placement by the BOP to home confinement is appropriate. The motion will be denied.

I.

In 2015, Ball pleaded guilty to conspiracy to distribute cocaine and heroin. He, along with 25 co-defendants, was part of a large drug trafficking organization that distributed illegal substances in several states and the country of Mexico. The Court sentenced Ball on September 15, 2015 to prison terms totaling 120 months. Ball currently is confined by the Bureau of Prisons (BOP) at FCI Milan, a low security correctional center in Michigan. His projected release date in July 20, 2023. He has served about 54 months of his 120-month sentence.

On May 14, 2020, Ball submitted a terse request for early release, explaining that he "completed Rdap [the BOP's residential drug abuse program] and done some college and tons of programming," and he asked to be released on home confinement so that he could support his family. He submitted another request a week later requesting home confinement under the CARES Act due to the health risks posed by the coronavirus pandemic. Apparently, he never heard back. The defendant then filed a *pro se* motion for compassionate release on June 29, 2020. The Court appointed counsel and ordered a response from the government. Ball's attorney since has supplemented the motion and replied to the government's response.

Ball is a 48-year-old Caucasian man with a history of high blood pressure, obesity, and an eye injury he sustained before his incarceration. According to his medical records, Ball is 5'4" and weighs about 190 pounds, making his body mass index about 32.6. His records also reflect that his blood pressure hovers around 136/84, placing him in the first stage of hypertension. *Ibid.*; *Blood Pressure Chart: What Your Reading Means*, Mayo Clinic (Jan. 09, 2019), https://mayocl.in/3hMDOFK. He also has hyperlipidemia (high cholesterol), alcohol use disorder, pain in his hands and feet, and blindness in one eye. He takes medication for pain (but not hypertension) regularly.

FCI Milan, where Ball is held now, currently houses roughly 1,362 inmates.  As of August 19, 2020, two inmates and one staff member were infected with COVID-19, three inmates had died from COVID-19, and 92 inmates had been infected and recovered from the virus.  *See* https://www.bop.gov/coronavirus/.  According to a recent report, 55 staff have tested positive, 54 have recovered and returned to work, and one is pending recovery.

This incident was not Ball's first run in with the law.  He has five prior felony convictions since 1990.  Between November 1 and November 20, 1990, the defendant was convicted of three counts of delivering or manufacturing marijuana.  In 1991, he was convicted of receiving stolen property.  And in 1994, he was convicted of manslaughter and possessing a firearm as a felon.

However, Ball has behaved relatively well in prison.  He was recently disciplined on April 14, 2020, for refusing to move to another unit.  However, Ball insists that he objected only because he believed that staff wanted to move him to an area with COVID-positive inmates, where he would not be able to protect himself appropriately.

When released, Ball intends to live with his mother in Southgate, Michigan, and hopes to continue working for an automotive glass supplier.  Ball is married and claims to be a "very engaged step-father to a nine-year-old girl."

## II.

As a general rule, "a federal court 'may not modify a term of imprisonment once it has been imposed.'"  *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020) (quoting 18 U.S.C. § 3582(c)).  "But that rule comes with a few exceptions, one of which permits compassionate release."  *Ibid.*  "The request may come through a motion in federal court filed by the Director of the Bureau of Prisons. 18 U.S.C. § 3582(c)(1)(A).  Or it may come through a motion filed by the inmate after he has 'fully exhausted all administrative rights to appeal a failure of the Bureau of

Prisons to bring a motion on the [prisoner]'s behalf' or after 'the lapse of 30 days from the receipt of such a request by the warden of the [prisoner]'s facility, whichever is earlier.'" *Ibid.* (quoting 18 U.S.C. § 3582(c)(1)(A)).

Upon a proper motion via either avenue, the Court may, "[a]fter 'considering the factors set forth in section 3553(a) . . . reduce the prisoner's sentence if it finds that 'extraordinary and compelling reasons warrant such a reduction' or if the '[prisoner] is at least 70 years of age,' has 'served at least 30 years,' and meets certain other conditions." *Ibid.* (quoting 18 U.S.C. § 3582(c)(1)(A)(i), (ii)). Ball relies on subparagraph (i) of the statute. Under that provision, the Court can order a reduction of a sentence, even to time served, *first*, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," *second*, if "extraordinary and compelling reasons warrant such a reduction," and *third*, if the "reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). The Sentencing Commission's policy statement is found in U.S.S.G. § 1B1.13, which simply recites the statute. The commentary adds gloss, which does not have the force of law. *United States v. Havis*, 927 F.3d 382, 386 (6th Cir.), *reconsideration denied,* 929 F.3d 317 (6th Cir. 2019) (en banc) (holding that the "commentary has no independent legal force — it serves only to *interpret* the Guidelines' text, not to replace or modify it").

## A.

The government does not take issue with the timing of Ball's motion filed here in relation to the date he presented his request to the warden. Instead, the government points out that Ball's requests did not mention compassionate release — he asked only for home confinement — and in his first request he never mentioned COVID-19 as a basis for relief. The government argues that

a defendant cannot claim proper exhaustion of administrative remedies unless he presents to the warden the same bases for relief that he advances to a court.

There is no question that Ball's first request, submitted on May 14, 2020, did not mention compassionate release or the coronavirus pandemic; it focused exclusively on his education in prison. However, Ball's second request referenced the "CareAct [sic]," expressed concern about COVID-19, and requested home confinement. Home confinement can be viewed as a term of art, or it can amount to a generic request to be allowed to reduce a sentence to eliminate part of a prison term. A reduction of a sentence, of course, is precisely the form of relief that section 3582(c) authorizes. 18 U.S.C. § 3582(c)(1)(A) (allowing a court, under certain conditions, to "reduce the term of imprisonment," "impose a term of probation," or order an extended term of "release with or without conditions").

The government also takes the position that Ball must catalog all his physical ailments before proper exhaustion can occur. Although there is some support for the government's position, *see United States v. Asmar*, No. 18-20668, 2020 WL 3163056, at *3 (E.D. Mich. June 5, 2020), the majority of federal courts confronted with the argument now raised by the government generally have been skeptical of the notion that the statute imposes any requirement of "issue exhaustion" on requests for compassionate release, or that a prisoner explicitly must mention the pandemic as a basis of his administrative request, or else submit and exhaust a fresh request on that ground — and wait yet another 30 days — before seeking judicial review. *United States v. Garner*, No. 14-13, 2020 WL 3632482, at *3 & n.2 (S.D. Tex. July 3, 2020) ("This question of 'issue exhaustion' has not been addressed by the Fifth Circuit Court of Appeals, and it may well be applicable in certain situations. However, the Court is not persuaded that it applies in this case, primarily for the reasoning offered by the Government elsewhere in its response: COVID-19 does

not constitute an independent basis for . . . compassionate release.") (collecting cases); *see also Miller v. United States*, No. 16-20222, 2020 WL 1814084, at *2 (E.D. Mich. Apr. 9, 2020) ("[T]he Government argues that Miller's exhaustion should not be honored, because he did not specify requesting release due to the COVID-19 outbreak.  The Court finds this argument to be unfounded.  Miller, then and now, seeks release due to his myriad of serious health conditions.  The COVID-19 pandemic merely accentuates his meritorious claims for release.").

Here, the statutory ground for the request has not changed from when it first was submitted; the defendant seeks now, as he did at the administrative level, "early release" to home confinement based on extraordinary and compelling circumstances under the authority of 18 U.S.C. § 3582(c)(1)(A)(i).  He described the basic circumstances in his administrative petition that he felt were extraordinary and compelling ("Covid-19 'Care Act'").  He now advances others, which may or may not have arisen since the request first was tendered.  But the underlying authority and ground for the relief sought has not changed, and it would be inappropriate under the circumstances to impose any further exhaustion requirement, which in any event is not mandated in any plain terms of the statute.  *See Garner*, No. 14-13, 2020 WL 3632482, at *3 (S.D. Tex. July 3, 2020) ("Defendant has not changed the underlying basis of his request for . . . compassionate release by this motion; to the contrary, he argues that COVID-19 renders him even more medically vulnerable than before.  In short, Defendant argues that the COVID-19 pandemic increases his already-existing medical vulnerability, which he has already exhausted.").  The BOP certainly well knew, and now knows, about the pandemic and the risks to inmates, as its published reports and directives evidence.  It has had more than ample time to act on the defendant's May requests, having before it all of the pertinent information about both the defendant and the circumstances that pose risks to his health.  As one district court aptly observed:

> The statute does not require issue exhaustion as argued by the United States and even if the Court was inclined to impose that requirement, it would be futile. The Court is frustrated by the fact that the warden has apparently ignored the first request. There is nothing in the record to suggest a second request by Defendant would be treated in any other way. By ignoring these requests, the warden is inviting the Court's involvement. This Court will accept that invitation. The COVID-19 pandemic requires action, and the Court is not willing to wait.

*United States v. Dillard*, No. 15-00170, 2020 WL 2564638, at *2 (D. Idaho Apr. 27, 2020).

The defendant sufficiently presented his request for release to prison authorities, and he has waited more than 30 days for a favorable response, which has been refused. That is sufficient to satisfy section 3882(c)(1)(A)'s exhaustion requirement.

B.

The government offers several reasons for denying release. It insists that compliance with the Sentencing Commission's policy statement is mandatory, and points to one line in section 1B1.13 that requires the prisoner to prove lack of dangerousness. But that requirement is a condition of 3582(c)(1)(A)(ii). Ball has invoked 3582(c)(1)(A)(i), which contains no such requirement.

That is not to say that dangerousness is irrelevant. It is a factor incorporated in section 3553(a), which must be "consider[ed]" before release for extraordinary and compelling reasons may be allowed. *See* 18 U.S.C. § 3553(a)(2)(C) (requiring a sentencing court to consider "the need … to protect the public from further crimes of the defendant"). And any sentence reduction also must account for "the seriousness of the offense," the need "to promote respect for the law," and "afford adequate deterrence to criminal conduct." *Id.* § (2)(A), (C). These factors are to be considered together with the prisoner's circumstances to arrive at a conclusion that they are sufficiently extraordinary and compelling to justify a sentence reduction.

Ball's crimes were serious, and his criminal history, although somewhat dated, was troubling to the Court at the time of sentencing. Ball was a mid-level member of a wide-ranging

drug trafficking conspiracy that distributed heroin and cocaine over several states.  Ball himself was accountable for at least ten kilograms of cocaine.  He had five prior felony convictions for serious crimes, including manslaughter and weapons offenses, and he was on probation when he was involved with this conspiracy.

The sentence in this case was driven mainly by the mandatory minimum prison term required for the type and quantity of drugs involved, *see* 21 U.S.C. § 841(b)(1)(A), but the Court also believed that the penalty was warranted by the seriousness of the crime and the defendant's criminal background.  And the government pointed out, as it does here, that Ball could have faced a mandatory life term if the government had chosen to file a penalty enhancement information based on Ball's prior felony drug offenses.  *See* 21 U.S.C. § 847.  The Court determined at the time that the sentence was necessary to achieve the goals of sentencing Congress identified in 18 U.S.C. § 3553(a).  One of the goals — protection of the public — was paramount in this case.

Ball has done well enough in a prison setting.  He has had a recent disciplinary encounter for which he has provided a suitable explanation.  And he has completed several adult education courses.  But as commendable as Ball's conduct in prison has been, it does not alter the historical fact that the Court undoubtedly imposed a sentence that was not greater than necessary to achieve congressional goals.  Reducing that sentence by half would not promote respect for the law or provide a just punishment for Ball's crimes.  Nor would it serve as a significant deterrent to others.  Consideration of the factors in 18 U.S.C. § 3553(a) does not favor a sentence reduction, but they are not disqualifying.

To establish extraordinary and compelling reasons for the relief he requests, Ball points to the conditions of his physical health, arguing that he is vulnerable to complications if he were to contract COVID-19.   And he is understandably concerned about being infected with the

coronavirus.  "The COVID-19 virus is highly infectious and can be transmitted easily from person to person.  COVID-19 fatality rates increase with age and underlying health conditions such as cardiovascular disease, respiratory disease, diabetes, and immune compromise.  If contracted, COVID-19 can cause severe complications and death.  Because there is no current vaccine, the Centers for Disease Control and Prevention ("CDC") recommends preventative measures to decrease transmission such as physical distancing, mask wearing, and increasing focus on personal hygiene such as additional hand washing."  *Wilson v. Williams*, 961 F.3d 829, 833 (6th Cir. 2020).  "The COVID-19 pandemic is extraordinary and unprecedented in modern times in this nation.  It presents a clear and present danger to free society for reasons that need no elaboration."  *United States of America v. Ortiz*, No. 16-439, 2020 WL 3640582, at *2 (S.D.N.Y. July 6, 2020).

Moreover, "the crowded nature of federal detention centers presents an outsize risk that the COVID-19 contagion, once it gains entry, will spread.  And, realistically, a high-risk inmate who contracts the virus while in prison will face challenges in caring for himself.  For these reasons, in the past months, numerous [federal] courts . . . have ordered the temporary release of inmates held in pretrial or presentencing custody and, in more limited instances, the compassionate release of high-risk inmates serving federal sentences."  *Ortiz*, 2020 WL 3640582, at *2 (collecting cases; footnotes omitted).

Ball states that his comorbidities are obesity and hypertension.  His medical records indicate that he was 64 inches tall and weighed 190 pounds, making his body mass index (BMI) about 32.6.  *Adult BMI Calculator*, Centers for Disease Control and Prevention (July 6, 2020), https://bit.ly/2ZKLjqx.  Clinical obesity begins at a BMI of 30.  *Defining Adult Obesity*, Centers for Disease Control & Prevention (June 30, 2020), https://bit.ly/2ZM2Z5q ("Class 1" obesity

ranges from 30 to under 35 BMI).   The CDC has listed obesity as a condition that is associated with complications from COVID-19.

Ball also has high blood pressure, commonly referred to as hypertension.  The CDC states that individuals with hypertension "*might* be at an increased risk for severe illness from COVID-19."  https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/ people-with-medical-conditions.html (emphasis added).  Drilling down, though, that condition is grouped with "serious heart conditions" that predispose a person to higher risks of complications.  Also included are "heart failure, coronary artery disease, congenital heart disease, cardiomyopathies, and pulmonary hypertension." *At Higher Risk for Severe Illness*, Centers for Disease Control and Prevention (May 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.  Although the CDC recognizes "pulmonary hypertension" as a serious heart condition that may put people at a higher risk of severe COVID-19-related complications, Ball's medical condition does not include him in the high-risk designation.  *See, e.g., Pulmonary Hypertension-High Blood Pressure in the Heart-to-Lung System*, American Heart Association, https://www.heart.org/en/health-topics/high-blood-pressure/the-facts-about-high-blood-pressure/pulmonary-hypertension-high-blood-pressure-in-the-heart-to-lung-system (last visited August 19, 2020) (comparing pulmonary and systemic blood pressure).  Whether systemic hypertension, alone, exposes someone to heightened risk is unclear.  *Compare Malam* ---F. Supp. 3d---, 2020 WL 2468481, at *7 (ordering supplemental briefing) *with Perez-Perez v. Adducci*, --- F. Supp. 3d ---, No. 20-10833, 2020 WL 2305276, at *3 (E.D. Mich. May 9, 2020) (granting petition for habeas corpus because defendant had hypertension and was housed in a facility with a confirmed case of COVID-19).

That leaves one risk factor to support his assertion that extraordinary and compelling reasons justify a sentence reduction.  Sometimes that can qualify, but not usually.  The common features of the recent cases where inmates have been granted judicial relief on motions for compassionate release due to the pandemic are either (1) properly exhausted claims that unreasonably were refused despite the existence of severe, chronic, or terminal conditions that could warrant release even in the absence of a pandemic, or (2) in cases where the defendants had severe medical conditions that placed them at high risk of coronavirus complications, were housed at a facility with confirmed cases, and had served a large majority of their sentences.  *E.g., United States v. Reads*, No.  16-20827, 2020 WL  2572280, at *3 (E.D.  Mich.  May 21, 2020) (ordering compassionate release of 33-year-old inmate with severe obesity, severe obstructive sleep apnea, hypertension, and "prediabetes"); *United States v. Saad*, No. 16-20197, 2020 WL 2065476 (E.D. Mich. Apr. 29, 2020) (ordering compassionate release of inmate who had served 33 months of a 72-month sentence for a non-violent drug offense, was 71 years old, and suffered     from medical conditions including kidney disease, hypertension, pulmonary hypertension, sleep apnea, shingles, diabetes, back problems, a frozen thigh from an overdose of coumadin given by prison officials, and who also had a history of heart surgery and knee replacement, and a recent diagnosis of kidney cancer); *United States v. Nazzal*, No. 10-20392, 2020 WL 3077948 (E.D. Mich. June 10, 2020) (ordering compassionate release of 65 year old defendant with a history of heart disease, severe asthma, benign prostate cancer, high blood pressure, type 2 diabetes, who served 69% of his sentence for a non-violent fraud offense, had only one minor disciplinary incident, and was housed at a facility with several confirmed COVID-19 cases); *United States of America v. Jajun Omar Gardner*, No. 14-CR-20735-001, 2020 WL 4200979, at *5 (E.D. Mich. July 22, 2020) (ordering compassionate release where defendant reported a number of serious

medical issues, many of which the government did not dispute, including a history of hypertension, a heart condition, stage-two kidney disease, hyperlipidemia, lumbar disc disease, lumbar herniation, spinal cord impingement, an artificial knee joint, an artificial shoulder cup, and sickle cell trait).  By comparison, Ball's argument does not pass the extraordinary-and-compelling threshold.  He is a relatively young man in good health housed in a unit with no confirmed COVID-19 cases.

None of this is to minimize the seriousness of the coronavirus pandemic or the alarming rapidity of its spread within federal prisons.  But the pandemic is a global phenomenon and some risk is inherent no matter where Ball resides, either at home or in prison.  He asserts that his risk would be lower at home, but he has not put forth any convincing evidence to demonstrate that he is at an especially elevated risk of harm in the present situation of confinement.  And Michigan has a significant number of confirmed COVID-19 cases.  Ball has not established extraordinary and compelling reasons based on his physical health, and when the factors in section 3553(a) are "considered," Ball has not shown justification to reduce his sentence to time served.

III.

Ball also requests that the Court recommend that the BOP place him in home confinement under the CARES Act, 18 U.S.C. § 12003(b)(2).  A defendant's request for home confinement under the CARES Act can be construed differently than a request for compassionate release under 18 U.S.C. § 3582(c)(1)(A).  *See* Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281 (2020); *United States of America, v. Benjamin Gordon*, No. CR416-082, 2020 WL 3964041, at *1 (S.D. Ga. July 13, 2020).  Section 12001(b)(2) is directed at the Attorney General.  If he finds that emergency conditions will materially affect the functioning of the BOP, the Director of the BOP may lengthen the maximum amount of time for

which the Director is authorized to place a prisoner in home confinement under the first sentence of 18 U.S.C. § 3624(c)(2).  Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281 (2020).  And the Attorney General has done just that: in a memorandum issued on April 3, 2020, the Attorney General utilized his authority under the CARES Act to direct the BOP to "immediately maximize appropriate transfers to home confinement of all appropriate inmates held at FCI Oakdale, FCI Danbury, FCI Elkton, and at other similarly situated BOP facilities where COVID-19 is materially affecting operations." *See* Memorandum from the Attorney General to the Director of the Bureau of Prisons (Apr. 3, 2020), available at https://www.justice.gov/file/1266661/download.

But under section 12001(b)(2), "[d]esignation of an inmate's place of confinement, including placement in home confinement, rests within the absolute discretion of the BOP." *United States v. McCloskey*, No. 18-CR-260, 2020 WL 3078332, at *2 (S.D. Ga. June 9, 2020); *see also United States v. Calderon*, No. 1911445, 2020 WL 883084, at *1 (11th Cir. Feb. 24, 2020) (explaining that under 34 U.S.C. § 60541(g)(1)(A), the Attorney General "may" release eligible elderly offenders, and the district court was without jurisdiction to grant relief).  Therefore, the district court has no authority to grant relief under section 12003(b)(2).

However, the defendant's request might be invoking a similar provision of the Second Chance Act.  "The Second Chance Act of 2007 . . . increases a federal prisoner's eligibility for pre-release placement in a halfway house from 6 to 12 months, and requires the Bureau of Prisons (BOP) to make an individual determination that ensures that the placement is 'of sufficient duration to provide the greatest likelihood of successful reintegration into the community.'" *Vasquez v. Strada*, 684 F.3d 431, 432-33 (3d Cir. 2012) (quoting 18 U.S.C. § 3624(c)(6)(C)).  "In accordance with the Act, regulations were issued so that placement in a community correctional

facility by the BOP is conducted in a manner consistent with 18 U.S.C. § 3621(b)."  *Ibid.* (citing 28 C.F.R. § 570.22).  That statute, in turn, states that any recommendation by the sentencing court that a convicted person serve a term of imprisonment in a community corrections facility "shall have no binding effect on the authority of the Bureau . . . to determine or change the place of imprisonment of that person."  18 U.S.C. § 3621(b).  Relevant factors that the BOP shall consider include "(1) the resources of the facility contemplated; (2) the nature and circumstances of the offense; (3) the history and characteristics of the prisoner; (4) any statement by the court that imposed the sentence; and (5) any pertinent policy statement issued by the Sentencing Commission."  *Lovett v. Hogsten*, No. 09-5605, 2009 WL 5851205, at *1 (6th Cir. Dec. 29, 2009) (citing 18 U.S.C. § 3621(b)).

Ball's prison record appears to be unremarkable.  The Court believes that the BOP is in a better position than the Court to assess the propriety of the defendant's placement for reentry at an appropriate time, based on the applicable statutory factors and all of the information then available. However, the Court recommends that the BOP give careful consideration to placing Ball in a community setting as soon as circumstances permit.

IV.

Ball has exhausted his administrative remedies, but he has not demonstrated that compassionate release under 18 U.S.C. 3582(c)(1)(A)(i) is justified.

Accordingly, it is **ORDERED** that the defendant's motion for compassionate release (ECF No. 707) is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  August 19, 2020